we call our second case of this morning it's number 19-3855 Noga v. Fulton Financial Corporation Employee Benefit Plan et al. Backrack and Mr. Tybee or Ms. Tybee, Brett I'm sorry. Ms. Brett thank you. I apologize. No worries. Thank you Ms. Brett privilege having you here. Mr. Backrack. Thank you very much. Thank you your honor. Is my video showing now? Yes sir. Thank you. Just wanted to make sure. May it please the court. Good morning. Joshua Backrack. I represent the appellant Reliant Standard Life Insurance Company and I'd like to reserve three minutes of time for rebuttal. That's fine. We're appealing from the district court's decision that it was arbitrary and capricious for Reliant Standard to discontinue long-term disability benefits under this ERISA benefit plan. Many of the reasons given by the district court for its rulings are contrary to decisions by this court and the way in which the arbitrary and capricious standard of review should be applied. But before addressing those issues I think it's helpful to look at the claim facts and in particular the difference in Mr. Noga's condition from the time benefits started and when they were discontinued a few years later. Mr. Noga stopped working. The thing here is there are some reports that say that there has been progress and yet you have two nurses, three nurses. One saying I think we probably need a little more information but the other two, Nurse Vico and Nurse Toth are saying okay we've looked at it and he continues to be unable to work. In the case of Toth, she said that they should reinstate the benefits and then they went back to Dr. Klein because Nurse Toth along with Nurse Vico had said he can't work. So we don't know necessarily why that was done. I think the judge may have had some suspicions but now there's a submitting of Mr. Jackson's proposed affidavit. But aren't we really confined to the administrative record? Not at all, that's what this court has said in numerous cases that you're confined to the administrative record only with respect to claim facts such as whether there's medical evidence. So for example if a claimant tries to submit or if a defendant plan tries to submit additional medical evidence during the litigation that's not allowed. Aren't these claim facts here? These are procedural. I mean doesn't Jackson's affidavit include claim facts? No. If it doesn't then we should evaluate arbitrary and capricious without it because it has no claim facts. If it has no claim facts then it cannot bear on the arbitrary and capricious decision, right? I disagree your honor. This court stated in Post v. Hartford that evidence regarding a conflict of interest or procedural regularity has to be considered. But that was in the context of the beneficiary learning about the conflict later. Not when it was the plan administrator who had the conflict and who made the record knowing the whole while that it had the conflict and then after it made the record say now we'd like to supplement the conflict the entire time. It seems like it creates a special rule for entities with a conflict to say well since the entities without a conflict get the supplement we should get the supplement too which is a quite a windfall to plan administrators who also control the benefit determination. Is there any case that has ever said that the entity with the conflict gets the supplement? Well yes your honor there is. Howley v. Mellon financials which we cite to in our brief 625 f 3rd 788 and page 794. Courts plainly must be willing to consider the evidence relating to the nature extent and effect on the decision making process of any conflict of interest. In Howley it was the court finding that the district court erred in resolving this issue of a conflict without doing any fact finding and that would have favored the defendant. So they said the district court should have allowed the district court to do so. But your honor I really have to point this fact out which which distinguishes this case especially from what your honor is saying judge Phipps. This evidence was in the administrative record already regarding the reasons why these this evidence was sent out. The medical records were sent to two additional doctors during the uh the appeal. That was there in the record and it was never this happened before the appeal so the claimant's entitled to get a copy of the administrative record. Claimant would able to see all that. This was not part of their administrative appeal. If they had said to us with all these facts available to them hey look you have a conflict here because why did you go get the these two peer reviews when you already had a nurse telling you that he's disabled. We would have addressed it. This is you know and counsel makes the argument that we raised a post-hoc rationale that was brought up by the claimant could have been brought up in the administrative proceedings and to allow us to not address it then and tie our hands behind our backs is wrong. Well it seems that like you're you're conflating uh to some extent um the structural conflict issue uh with with procedural irregularities and those are two separate things um as well as uh substantiality of evidence that we need to consider here for for uh whether the ultimate decision was arbitrary and capricious right? Well I disagree to some extent because the conflict I mean if there's a procedural regularity where does that get you? Does that make our case law distinguishes between those as different categories of things that we need to examine right? They they are different but they are all pointed toward the same thing and whether there's been a full and fair review to the claimant. Well when we look at Howley and this exception for extrinsic evidence Howley is dealing with the issue of structural conflict. The affidavit that we have here goes purely to a question of a procedural irregularity. It's the it's the decision to to switch uh the day after having recommended reinstatement to then um send send out uh for another independent medical examination right? I I am unaware of any authority from any circuit that distinguishes evidence that may be admitted on that subject to just the claimant. You know I'm reminded of a case out of the My distinction was not the the claimant versus uh the the uh the insurer. It was between a structural conflict and a procedural irregularity. Howley and the case law seem to indicate that there are certain exceptions when extrinsic evidence will be permitted for a structural conflict right? But but you were asking us to extend that to procedural irregularities. I think in Post versus Hartford it discusses procedural irregularities. It specifies procedural regularities and not just a conflict of interest. I think the question here though your honor is really this. If a claimant is allowed to allege something that's before them for the first time in litigation without letting the defendant know that that's an issue, how is that fair? How is it fair to not allow the defendant to then explain it? And I and I truly do feel that you know if claimant argued there's a conflict of interest because of the defendant did this, if they had just changed those words, wouldn't it be the same analysis? So I'm not sure that just saying this is a conflict, this is this versus being a procedural irregularity matters one bit. I think once it is raised, both sides as stated in Howley, both sides have to be able to comment on it and to explain it. Especially especially when that was clear and present in the record before the decision on appeal but it was never raised by the claimant, giving us no opportunity to address it. And by the way it was clear and present on the record, are you saying that there's someplace else in his notes or in the termination letter, the explanation that's given to a beneficiary, that there's an explanation of the decision to send it out for a medical examination? No, what I'm saying is that those claim notes were present and given to the claimant and his attorney and clearly explained what happened, the process, these claimed irregularities, claimed conflict was in the record there and it wasn't brought to our attention. And if it had been, it would have been addressed as it was. So I guess your position is that your client operates with a conflict of interest and it doesn't have to say anything or address that conflict of interest in any way shape or form unless that's challenged administratively. Well the law presumes MetLife versus Glenn, it is presumed that we operate under a conflict of interest. But it's important to note that in Glenn, the Supreme Court stated that conflict is just one factor. It's not dispositive of the whole issue here. But so I guess I'm struggling. If it's presumed that you've got a conflict and you didn't rebut the conflict in the administrative record, how is it their fault for not raising the fact that there's a conflict? It's the specific issue that wasn't raised. We weren't alerted to this, your honor. How should we know that they're going to claim that there is this conflict or procedural regularity that influenced the decision when it's there before them but they haven't raised it to us? I'm talking about the specific instance. So your honor, in general, yes, we're presumed to have a conflict of interest. And so in this specific instance, why don't you have to rebut the application of that presumption instead of put the burden on them to raise it? If you're presumed to have it, it strikes me as a little odd to say, yes, we recognize that we're presumed to have this conflict. In this one specific instance, the presumption applies. And now you say, gee, they didn't challenge that presumption. It strikes me if you want to get out from the presumption, then the burden is on you and your client to show that in this specific instance, we can rebut the presumption when we send this back out the day afterwards. And this is why. And you could put the information that was in the Jackson affidavit, but it's not there. And so I don't know how you can both get out of the general presumption by saying this is a specific instance without rebutting that general presumption in this specific instance. Your honor, that's actually contrary to MetLife First Glenn. It is. The court said that there should not be any special procedural rules. And in fact, the 11th Circus addressed the specific comment that you've made in a case called Doyle and said that the burden does not flip to us, that the claimant must introduce evidence of the conflict of interest. Yes, there is a conflict. And under MetLife versus Glenn, the question is how much weight do you give to it? It's a factor. But under MetLife versus Glenn, the claimant still has the burden to show that it influenced the decision in this particular case. And in this case, the claimant did not do so during the claim process, did it for the first time during the litigation and did not allow the court then didn't allow us to rebut an argument that was raised for the first time. So your honor, Judge Phipps, I really disagree with that statement of yours that we had to put something into the record at that point on an issue that we didn't know was an issue. And there's good reason, you know, there is good reason. Instead of thinking about this as a structural conflict, we look at it as a procedural irregularity. And in that circumstance, isn't the reason it should have been addressed, the very reason that we're all here today, that is, that is, raises a significant question, just looking at the about face in decision making as to why that there was that change of heart. All that would be required is some further explanation, not in a post hoc affidavit, but in the notes or in the termination letter. Why wasn't that sufficiently clear at the time to, as my colleague has suggested, to prompt some further explanation from your client that had the information then in its possession? The examiner didn't believe that it was necessary that he was following his procedures, which he laid out in his affidavit and explained what happened. So can you just walk me through, can you just walk me through what you think that Noga should have done? A benefits determination may be grants him benefits. Probably not supposed to object to that and say there's a conflict, right? Just got granted benefits. It's strange to object to the granting of benefits. And then shortly afterwards, there was a referral out. I guess at that referral out, should there have been an objection for the conflict to materialize? Your Honor, you're focusing on the conflict, which is a factor, and completely ignoring the medical evidence. You're now putting a burden on the defendant that is beneath to know. Just answer the question of when should this objection have been made? Regardless of whether I'm focusing on the wrong thing or not, originally you said that it wasn't and raised this for the first time in the district court. Just to tease out that point that you made a little further, when was the opportunity administratively present to raise this? Probably not immediately following the granting of benefits. Had to be at some other interstitial time, and when is that time that you say that they waived the issue? Well, when they received the claim file, and every claimant's allowed to see the claim file requested, they get the claim file in, and they see that there is the claim notes. At that time, would have shown them that I believe that there was this request, that the denial, right? After the denial was made, they should have objected to the denial, and that would have given your client the ability to then explain the basis for the denial after it was made? Well, so the timing of it is Dr. Klein performs his IME. The claim is then denied, and there's an appeal, and during the appeal, the records are sent out to these two other doctors. My understanding is the claim notes would have reflected that. My understanding was that it was denied in December, right around December 27th, and then in March 22nd, Nurse Toth looked at everything and decided to reinstate backdating it back to December 27th of 2017, and only after that did Mr. Jackson ask for the examinations by Dr. Braithwaite and Ayer. Is that correct? Yes, that's correct. You're right. I see your point, Judge Phipps. I see your point, but I have seen it time and again when somebody has requested the records during the appeal, and they've said, when was this done? Can you provide updated notes? And this happens frequently during an administrative appeal, but I think it's important because what we're leading down the path of is that a nurse can overrule a doctor's opinion, and that's the specific reason in the affidavit from Mr. Jackson why he said he had to send those records out for review by two doctors is because it's their rule that a nurse, once you have either a paper review or an IME by a doctor, we had Dr. Klein's opinion, and there's no question about him. There's no alleged procedural regularity there that you then have to have a doctor reviewing subsequent records. Can I just peel that back a little? Because my understanding was that the reason for that rule was because if a nurse does a subsequent review, it's more susceptible to challenge because a nurse is kind of reviewing what a doctor did, and so to preserve yourself and insulate yourself from those sorts of challenges, you want another doctor to look at it to say a doctor reviewed a doctor, and therefore everything's very, very, very valid. But it strikes me that that's more to defend yourself in a case where you deny benefits, not a rule where you grant benefits, and so because if the rationale for that rule is to protect yourself against challenge, the odds of being challenged when benefits are granted are, I think, appreciably less. I disagree, Your Honor. I think it's a rule that was based on the fact that a nurse shouldn't be able to overrule the opinion of a medical doctor, especially a specialist. But you've got a bunch of doctors. You've got treating doctors who say he was disabled. Nurse Moore said she needed more records. What would happen, let's say, Dr. Klein, in his November of 17 examination? What if he said, I believe he is disabled? And then Nurse Toth looks at it and says, I disagree with that, and I'm going to deny benefits and not reinstate them. It wouldn't have been sent to Nurse Toth. Once there is a medical doctor's opinion, the nurses are not asked to provide opinions. I'm sorry, Your Honor. No, it's okay. I mean, the thing that sort of pops in your head, and I realize it's not in the record, to what extent are Drs. Klein, Braithwaite, and Ayer, are they repeat players in terms of doing examinations? Well, I'll answer that as honestly as I can. I have never seen Dr. Klein, and I think that issue, that question comes up more with paper reviews than with IMEs, in-person examinations. Dr. Ayer, I know I've seen a few times. I can't tell you how many. I've never seen Dr. Braithwaite before, but that was never argued that there was an irregularity on that basis. But Judge Ambrose, it's a good point that you raised because there is a distinction between Dr. Klein and these other doctors who were later involved. If you forget, you push aside those doctors, and I'm not saying they should be. I think all medical evidence should have been considered, and it wasn't. But even if you put aside Drs. Ayer and Braithwaite, you still have Dr. Klein's report. Dr. Klein's report was prepared, his examination and report were prepared before there was any alleged procedural irregularity here, and there was no basis for the district court here to refuse to consider it, which it did. The district court here said, we don't even know why Dr. Klein was requested, but it was because of the medical records that he was requested to do this. And, you know- Why was, yeah, that's a good question. Why was this matter sent to Dr. Klein in November of 17 in the first place instead of just relying on Nurse Vico's recommendation? Well, the nurse, the prior nurse, not the last nurse, but the one before- More was before that, yes. Right. Get updated medical records. And those updated medical records, and this is the point that I was trying to get to at the start, which I really think is important. I think we're trying to, in a way, these arguments almost put this beneath the threshold of de novo review. The focus on this procedural argument ignores the claim facts, and the claim facts here are really strong because we know at the time benefits stopped, he can't even walk without falling down. He's wearing orthotics. He has to use a quad cane, and he's got this neuropathy that is impairing him, and benefits are approved. But by the time of the final claim decision here, there was a significant change. His doctors indicated that his medication was working. He's walking a mile a day in a pool five days a week. Importantly, he's no longer wearing leg braces. He's no longer even needing to use that cane, that quad cane. And Dr. Daughtry, one of the doctors who he relies on, said that he's allowed to participate in moderate activity as tolerated. And one of the other doctors says- Does that mean it was arbitrary and capricious for the nurse to grant the benefits then? I don't think that's one piece of evidence. Was it arbitrary and capricious for the- I don't think that's- Because if all that's true and compelling, then the real point is that the nurse that approved the benefits, the nurses that did that, acted in an arbitrary and capricious manner. Well, actually, nurses don't approve benefits, Your Honor. Benefits are only approved by a claims examiner. A nurse- Sorry, the nurse's recommendations for the coded claim. Yes, sir. Yeah, and so the nurse said that she thought he was still impaired. But that's why you then get additional evidence, and you explore that evidence. And in Kaseba versus Merck, the Third Circuit said that we do not want to penalize plans for getting independent medical examinations. This court recognized the importance of in-person examinations over just paper reviews. And that was done- Mr. Conrad, the question here arises because for two years, your client did rely on nurses' determinations that there was total improvement. And then in September, having reviewed the pharmacy records and all of the other records as to his medical condition, the nurse concludes again that he's precluded from engaging in any sustained work function. And the recommendation is not to send it out for an independent medical review or even to go out and get additional records. It seems to be just the standard recommendation to update and revisit in five or six months. Isn't it that the fact that there was reliance on the nurse's recommendation for two years of paying benefits, and then there's suddenly this change in deciding to send it out to Dr. Klein, that is the first procedural irregularity that, as I understood it, was being raised by Mr. Novon. Judge Krause, sending it out for an IME can't be considered a procedural regularity. Under the Kaseba case, which I 58, and this court said, we trust that courts will not penalize plan administrators for seeking independent medical examinations at appropriate stages of the claims determination process. And that was done by with Dr. Klein. And, you know, it sounds like every stage of the process, when three nurses consistently have concluded, along with all of his treating physicians, that he's totally disabled. What is it that two years later is then justifying a decision to send it out for independent medical review that makes this an appropriate time to do that? The fact that he was no longer wearing leg braces, he was no, his doctor says he's no longer falling down. That's the basis for the claim. The basis for the claim, Your Honor, was that he could not even stand without falling down. And now he can stand, now he can walk, he can rec, he, you know, if this was de novo review, I don't think this would have been a difficult decision for the court to reach. Again, I fear that it's almost like we're being penalized by procedural regularities that I question here. We did what we were supposed to do, according to Kaseba. Kaseba, the problem, by the way, in that case, was that they waited until the appeal to request an IME. And the court was questioning that process, but made it a point to say, but we don't want to penalize, we don't want to persuade plans not to do this sort of activity. And what Your Honor is suggesting goes back under Kaseba and penalizes us and makes a plan to say, gee, maybe we shouldn't do these sorts of things, but they should. They should do it. And it almost sounds also like we're being penalized because we paid benefits too long. There was a change in his condition in late 2016, where he's able to stand, he doesn't need without braces, and he's able to exercise regularly. And we continue to pay benefits and updated records. But again, a nurse doesn't determine disability and a nurse doesn't determine whether an IME should take place. It was the examiner who decided, I want a better picture of this because looking at this record, he can walk without braces, he can walk without a cane. This isn't adding up. So it was the examiner who said, let's get an IME. And I think this is a good segue for to hear from Judge Brett and we'll get you back in rebuttal. Thank you, Your Honor. I apologize. No, no problem. Thank you, Judge Ambrose. May it please the court, my name is Tybee Brett and I represent the plaintiff appellee, Leah Noga. Reliance's argument boils down to a simple proposition that any facially plausible basis for terminating benefits has to be upheld under deferential standards. And that's simply not the law. If you, if you really examine their, their argument, or if you really examine, if you really examine their argument, and the basis for denial of benefits here, they concluded out of whole cloth without any regard to the DOT description of his job versus the employer's description of the job. And they simply held that, well, it's a sedentary occupation. And since he can sit for up to eight hours a day, he can go back to work. And that's really not the way. But the issue would rely on, on that, that point, the insurance policy in the Lasser case, didn't define regular occupation, but reliance's policy here does, does it not? It says that in the national economy, and I don't want to presume to understand, but what you said in Lasser, however, it seems to me at very minimum, it requires some kind of examination of what the job is. And in the whole denial of benefits, the termination of benefits procedure from the time that judge, and I want to talk about the, the IME, and I want to talk about Dr. Ayers report, there's no examination of the content of his job. He didn't just sit like a bump on a log and, and get paid to do that. He had to interact with clients, he had to analyze financial data. And, but it seemed like the big issue was whether he could get into a car and drive. And if somebody can walk in a pool, if you will, showing that there's been significant progress made over the course of two or three years, and perhaps no longer needs to drive, but can sit behind the desk, he might within the, within the confines of the reliance policy, be now able to continue his regular occupation. Well, I don't think so. Because one of the things that's really never discussed, and Dr. Klein's report really doesn't dispute this. But early on, Dr. Hill, his primary treating physician said that there were other things that he could not do, he couldn't concentrate, he couldn't interact. He was challenged on many different fronts. And I don't have, I have a quote here somewhere. But, but interestingly, if you look, you know, forgetting about the procedural irregularity and asking for Dr. Klein to do the IME in the first place, but if you actually read the report, which reliance never did, it concedes it agrees with the diagnoses of this treating physicians as a diabetic, peripheral neuropathy talks about the atrophy that comes with it. But the point is, the treating the treating physicians don't get extra weight anymore, do they? Um, well, they can't be ignored. I mean, no, I agree with that treating physician rule like there isn't social security. That's correct. But the court examining the district court examining the record is entitled to look somewhat skeptically at these IMEs and why they were requested, given the structural conflict of interest. Let me ask you some factual questions, because the factual questions we were asking your opposing counsel related to, in part, whether a nurse can reinstate benefits or decide that there should be benefits to begin with. In this case, you have some nurses doing so, a claim by Mr. Jackson, that only the claim examiner can do that. And when you have a differing opinion of a doctor, you go with the doctor, you don't go with the nurse. I mean, do you have any evidence or was any evidence put before the district court as to what you know about the processes of reliance, for example, have previous decisions been made exclusively by nurses that allow for benefits? I apologize. I didn't hear the whole question because my screen froze. That's okay. Do you have any evidence that decisions by reliance were based solely on conclusions of nurses to give benefits without submitting to a IME of a later doctor? I don't have any hard evidence dealing with reliance in this situation. But I would note in terms of this procedural irregularity, and you are correct in saying this, Mr. Jackson's role in his requesting the peer reviews, the reasons for that were procedural issues, not structural conflict issues. And it had the ability if that was their process, they had the ability when they're creating the administrative record to put that in there. But as an attorney who does a lot of these things, when I request records, I never get the procedures which explain the process by which they make their decision. That's not part of the administrative record. It could have been in the claim notes. It could have been elucidated in the claim notes. They have control over what goes in those claims. So just to tease that out though, let's just say that everything in the Jackson affidavit were in the claim notes. I mean, just assume it is. I mean, if that is, I mean, it strikes me that under the standard of review, under the extraordinary deference, it's kind of given in these sorts of decisions that that affidavit begins to explain the procedure for why these structural concerns, those procedural explanations may illuminate those as well. So it strikes me that if those were in the claim notes, that at least arbitrary and capricious review gets a lot, lot harder for you and your client. I don't see, in response to your question, I don't see what the Jackson affidavit does for them because he says, when I made my decision, I was not aware of Dr. Klein's report. Well, why wasn't he aware? His duty when he makes a decision is to look at the whole record. And it seems to him he wasn't doing that in that case. Moreover, they didn't follow the correct procedures because one of the questions or one of the issues that Mr. Baccarat tries to raise is they were sandbagged, you know, but we had no opportunity to challenge what was in these so-called peer review reports. Contrary to the regulations, which have been adopted by the Department of Labor, and I didn't raise this in my brief, I'm sorry to say, but under 29 CFR 2560.503-1 subpart H for little i, they have a responsibility before they make a decision to provide the peer review reports to the claimant to explain or to react to them or give the young doctor to take issue with what the findings are. Moreover, it doesn't help because if you look at the peer review reports, they don't really undermine the basis for deciding that Mr. Noga is disabled. All they really say, they agree with the diagnosis of his treating physicians, they agree that he has instability, they agree that he can't stand and walk on a regular basis, but they make the same mistake or provide some, I guess, basis for reliance to conclude that because he's capable of sitting for up to eight hours, which doesn't consider any of the material duties of his regular occupation. Again, whether you look at the DOT description in the file or the employer's description in the file, it makes absolutely no reference to that. But basically, there are human is and the basis for the termination of my work. And that's really an arbitrary and capricious review. It doesn't look at the whole record. It doesn't look at the material duties of his occupation. It doesn't look at all his diagnosis. What is your understanding of what his job entailed? My understanding of his job, he was a financial advisor or a registered representative. There's some dispute over what his title was, but it amounts to the same thing. Like any financial advisor, he had to ensure that the investments that he was recommending were compliant with various regulations. He had to make sales calls, whether by car, he required some mobility. There was a cognitive aspect to it, the same way that all our jobs are sedentary, we have to have some high level cognition to perform those jobs. He had to, it was sometimes stressful sometimes. And I think this is all again, whichever job description you're relying on, these are parts of his job. But he had to manage people, which Dr. Hill early on said he couldn't. And he did do, look at data sheets, which would have been difficult given his declining visual acuity, spreadsheets. I mean, think about if you're lucky enough to have a financial advisor, think about the things that you might expect that financial advisor to do. And usually if with a financial advisor, you go to that particular person, him or her, and or you talk with that person on the phone. So one of the questions is, can this person, is the job description entail a requirement of driving? And if it does not, can he do what he needs to do by while sitting behind the desk that people come to him or deal with them on a telephone? Well, again, I think it's sort of a tempest in a teapot. The DOT description even talks about interviewing clients in sales and servicing. And it seems to me to expand your sales network, you sometimes have to go out and meet with clients in their homes. What is reliance's policy required for a job, for a description of regular occupation? Uh, well, as performed in the national economy. So even if I concede the description of the job that I just gave you, I think is based on the DOT. I just want to get out from under that being a dispute, even if they were entitled to look at the DOT description. It's not all that different. It doesn't expressly say driving, but it talks about going out and interacting with clients. And it seems to me that the doctors, his treating providers were correct in saying that given his limited mobility issues, he couldn't do it. And I think we can see that he couldn't drive safely. Because he, he told Dr. Klein when he falls asleep, if he tries to drive, so he couldn't safely drive. But I don't see how with his limitations. Sure, he was walking in a pool, which was his aqua therapy for five times a week, which must've taken hours. Um, he tried to work part time and couldn't even do that with his limitations. Uh, which is when he stopped working altogether because it doesn't account for the fatigue that he had the pain, the numbness and the tingling. Uh, so he, his condition improved somewhat. It's stabilized, uh, thanks to his that he could, uh, look back to his job. And the thing that the nurses found him disabled about his really never contested, they said he didn't have consistent work function. That was the basis for the, uh, provision of benefits in the first place that, you know, for on and off, he could probably do some of the duties of his occupation, but the problem here is that you've got three different doctors, all supposedly independent who have said, concluded that he can work. And the standard of review is high deference. So why wouldn't we uphold a decision if a reasonable person could agree with the three independent doctors who concluded that he can work? Because if you look at this so-called independent doctors and said he can work, they don't say he can do his regular occupation. Again, whatever definition of the actual patient you look at, they simply say he with certain limitations, he can't stand repeatedly. He can't walk repeatedly. He can, but if you only look at us, he can do a sedentary occupation, but it doesn't say that he can do the duties of the occupation that he had. So those, to the extent that those reports, particularly Dr. Klein and Dr. Ayer, Dr. Breathwaite isn't particularly important because she just concludes he has diabetes, which is conceded and which was the trigger for his other issues. They concede his diagnoses. They concede that it limits his motility, but they say because his occupation is sedentary, he can return to work, but that's not, that's actually the social security definition. But here it's a much more generous decision. I mean, it's a broader definition of disability in the sense that he has to be, he has to be unable to do the material duties of his occupation, not any occupation. That's not the test. And Reliance ignored the words of its own policy in making this termination of benefits decision. Ms. Brett, if we conclude that with the independent medical examinations in the record, that there would be substantial evidence, the question of whether we should be looking at those independent medical records, whether they were properly admitted as part of the record here, becomes critical. And as to that, I wonder if you could address the points that Mr. Buckrock made as to whether we should consider the affidavit, given that there was not an allegation previously that the claims manager, in essence, fabricated the decision to changing his mind and sending it out again for further review. And the essence of the argument you make seems to be that the affidavit is really fabricating a basis for doing that post hoc, and therefore we shouldn't consider it. But where that kind of argument is only made after the fact, why shouldn't they be able to after the fact? Well, first of all, I'd like to address your first point about the external reports. And the fact of the matter is the judge reviewing this decision is going to look at them anyway, regardless of whether they were properly or improperly procured. And again, you have to look at the whole report. I believe it's the Connolly case where there are cases out there that say you can't just pick out the conclusion of a report, you have to read the whole thing. And the whole report by Dr. Klein and by Dr. Ayer do not support the termination of benefits, because they don't show that he cannot, that he can perform all the material duties of his regular occupation. It just is that he can do a sedentary job, which isn't necessarily what his duties and responsibilities are. As to your other question regarding this affidavit, is there is no case that says that either the claimant or the insurance company can submit external evidence going to a procedural irregularity. Structural conflict, yes. And it has to be, it can be a rule confined to the participant because the claimant has no opportunity to look into structural conflict. And the insurance company has no motivation to put evidence of the structural conflict in the record. As a practical matter, when you're out there in the field doing these cases, most judges limit your ability to introduce extrinsic evidence of structural conflict. So again, this is sort of a tempest in the teapot. But the other thing is, again, there's no case that says that either party, I couldn't introduce evidence of external evidence of a procedural conflict, procedural irregularity either. But they have the control to put this explanation of what they did in the record, in the administrative record, it could have been in the claim notes, they could have provided when they produce the administrative record, a copy of the internal guidance, which supported this decision making. That didn't happen there. So why give them a chance to buttress a decision after the fact? And we think of it as a sort of impeachment of a prior consistent statement, where we're, when you're making allegations of bias or fabrication, that there is in that sort of rebuttal or rehabilitation, the ability to introduce extrinsic evidence. How are they to know that you were going to challenge their legitimacy of the decision to send it out? They never gave us a chance. They should have known, they should have afforded us the opportunity to challenge those independent report, those peer review reports, based on the current regulations, which were adopted in January 1, 2018, the regulation that I read to you. So they should have, we should have had an opportunity to look at those at the time, and we didn't. There's nothing precluding us to raise a challenge again, about something that we didn't know about until the decision was made. So after the decision was made, there was no opportunity to challenge it. You get a decision. It says, this is what it is. This is what the reports say. You don't get a chance to say, hey, wait a second, those reports were improperly, you know, let's do this again. I mean, what you're saying is consistent with Howley. I mean, Howley said, look, it would be absurd to let people not supplement the record, a participant, not supplement the record with information that they only learned after the fact. And so, I mean, I guess, I guess the point, though, is, well, what if you challenge things after the fact? Would it still be absurd not to let the plan administrator supplement the record in light of your after the fact challenge? Should we just reopen the record for everyone? Or should we just, or is it a one sided rule? Because they knew of the conflict and their substantial evidence account for the whole record, and justify the conflict that they knew about the whole time, if it's not more than a procedural irregularity. Well, right now, the way the law is in the circuit, as in most circuits is that you cannot supplement the administrative record. That's the general rule. So the question is, can I, can I as a claimant's attorney make arguments after the fact that I then emerge only upon examination of the record that the defendant had control, that the insurance company had control over, and they could put anything they wanted into? I don't think that's unjust. But as a practical matter, I can't put in extrinsic evidence of that anyway, unless you're going to blow up the administrative record. The idea of confining the review to the administrative record, whether it's de novo or arbitrary and capricious. And if you want to turn, you know, I think the term in one case that I don't remember right now is you don't want to turn courts into, you know, subsequent plan administrators that completely redo the process, then there's no point in objection or a concern that you could have raised when he was when your client was sent out for this, the independent medical examination the second time. He was not represented by counsel. And they had the right to do it. I don't want to get caught up in the decision to, I think the decision to send him for an IME was suspicious. Because again, all the nurses looking at all the records said he was in he had inconsistent work function. And for that reason, he couldn't perform the material duties of his regular occupation, again, whichever definition of regular occupation you're looking at. But the report the the, I think the real error here was, if you look at Dr. Klein's report, it doesn't support the termination of benefits. Because he agrees with the symptomatology, he agrees with the diagnosis, he agrees with that he's unstable, unstable and has gait issues. But he's capable of sitting for I think the key to this case is and the reason why the lower courts decision has to be affirmed is because the decision says simply without looking at the material duties of his occupation, that because he was capable of sitting for up to eight hours a day, he's no longer disabled. And that's the wrong question that it answers the wrong question. It doesn't really get into the material duties of his occupation. And nobody ever connected his various symptom, various challenges, various conditions, and match them up with the material duties of his occupation. And that's, yeah, I wish Judge Schmel's opinion had been more expansive on this. But at the same time, I sympathize with not wanting to slog through this 200 page, nearly 200 page administrative record. Final, final, final question, my part, you, you argue, we shouldn't consider Mr. Jackson's affidavit. Now, previously, we've held that extrinsic evidence may be permissible to evaluate whether there's bias or conflict that affected the administrator's decision. Well, why not extend that precedent to allow evidence offered to disprove the existence of bias or conflict? Again, because if you're going to confine the review, for the most part, the presumption administrative record, the the, the insurance company here has an opportunity to put that in the administrative record in the first place. We can't put in such information because we don't know about it until after the fact we can't put it in. So I think, again, unless you want to open up these decisions to information beyond the administrative record, it should be very, very limited in terms of when any such extrinsic evidence could be involved. But again, this isn't the case that I'd want to die on this hill because I don't see the Jackson really helps that affidavit helps them very much, because to me, it seems to open up even more procedural irregularities. What it says is we have a policy that when there's a one doctor who says that the person can do the job, that it cannot be overruled by a nurse. He could have put it in his claim notes that accordance to this policy. I'm going to send it out. But any didn't do that. It could have been in the claim notes, and it wasn't there. All right. Is there any further anything further from my colleagues? All right, let's hear. Thank you very much for your time. Thank you. Mr. Bacroft. Thank you, Your Honor. There are a couple points that I need to clarify from counsel. Counsel said that we should have sent the paper the peer review reports during the appeal under the Arisa regulations. That is entirely incorrect. The new regulations only apply to claims that were submitted on or after April 1 2018. This was a 2015 claim. The regulations have nothing to do with this. This claim, the new regulations, I should say. So counsel is now trying to add another irregularity, and it just does not exist. Counsel also said that none of the doctors, including Dr. Klein, explained. They only said that he's capable of sedentary work and didn't explain why he couldn't do the other parts of his job. This is inaccurate, especially Dr. Klein is a very, very detailed report and says why the doctor believes he can do certain things at certain levels. That information is then sent to, and Ms. Brett knows this, that information is then sent to a vocational analyst who reviews the job requirements or the occupational requirements and confirms that they're able to do that. And that was done in this case. I think, you know, counsel saying that we just considered it sedentary is incorrect. But on the other hand, what is it that he can't do other than driving? Counsel mentioned that there was fatigue or cognitive issues that prevented him from working. And yet on January 22 2018, weeks after the denial, there's no mention of cognitive complaints in his own treating doctors evaluation, where it's one of the issues addressed to be addressed. In fact, and that's page 1280, I'm sorry, 1330 of the record. And there's a box, is there even mild impairment and the box is not even checked off. So that's not supported. Counsel said that he had a decline in visual acuity. Well, that wasn't even ever part of this claim. So counsel is just throwing more and more things here when there is no support and it's not part of the record. And then you have the driving issue. And Mr. Noga still clings to that as part of the material duty. And it clearly is not so. In McCann versus Unum, the court addressed, the Third Circuit addressed its prior decision in Lasser and said Lasser doesn't apply here. Lasser applies when there's no definition of regular occupation. And there are numerous other decisions that we cite to in our brief, both within this circuit and outside of this circuit that raised the same issue. That if there's a definition that includes a national economy, that's what's filed. That's what's followed. And significantly, this was never raised. This point can't be disputed. This was never raised that with vocational evidence by the claimant. There is no contrary vocational evidence in the administrative record to suggest that driving was a material duty of his regular occupation because it wasn't. And worse yet, clearly the district court judge believed that it was. On page two of his opinion, appendix page four, Reliance admits that Noga worked in a sedentary occupation and that his job description included the requirement that he must be able to drive to outside locations. So the district court relied on improper occupational duty in deciding that Mr. Noga was disabled. And I just want to briefly, if I may, your honors. Mr. Popper, could I trouble you to help me understand something in the record? And that's as to the affidavit, assuming that we do consider it, whether it's something that's helpful to you or not. The affidavit indicates that the reason for the change in view was that he realized after the fact that Dr. Klein had been asked to assess the plaintiff's functional capacity in the initial claim review. And he hadn't realized that an independent physician had performed a review in paragraphs 23 to 24. So, but his notes, if we look at appendix 220 or AR 144, 14 lines down, and I, this is perhaps you can clarify, is this the same claims manager entry? And what is the significance here? 14 lines down of, of him noting that the IME, an IME was conducted November 28th, 2017, indicating that Mr. Noga would be capable of gainful employment. Your honor, there should be a date on that, on the, on the top left. I apologize for having to ask. It's March 22nd, 2018. So that's. So that is around the same time, your honor. That is after the denial, that would have been the same person, but that's when he's, I believe that's when he is, is sending it out for around the time where he's saying that there needs to be these additional payer reviews. I think this is, this is the date that he concludes that the decision to terminate benefits is overturned and reinstated back to December 27th of 2017. Right. In other words, he looked at it and he approved it. Oh, he clearly did. He did. And then in hindsight, according to his affidavit, he said, oh, they should have been done. Now, maybe he did know there was Klein, Dr. Klein's report, and then said, oh, I shouldn't have done that because that's not the proper procedure. Maybe he didn't realize it. I'm not sure, but that's why under Howley, there should have been fact-finding. Maybe there should have been a hearing with the judge, or at least allowing us to submit our evidence, allowing her to contradict that. A lot of the times in these cases, the claimants fight for depositions or to conduct discovery on these sorts of issues. But here, none of that happened. It was just, here's our argument, take it and don't listen to them. I'm not sure I understand why there needs to be argument or fact-finding. His affidavit says that it was after entering the note that he realized Dr. Klein had been asked to assess functional capacity during the initial claim review. But his notes before making the decision to overturn benefits indicate he was already aware that there had been an independent medical review that was conducted and concluded that Mr. Nova was capable of gainful employment. I don't have in front of me that specific note as far as whether when that took place, the note you're referring to versus the nurse's opinion. I'm not sure. But I think the point was, well, the point is it shouldn't have gone to the nurse to begin with. That's the real point is what he's saying is it shouldn't have even gone to the nurse for that opinion. So why wasn't that, why is that only in the affidavit, not in the claim file? I mean, it strikes me that if, look, that might be a great point. But it seems like a very strange post hoc point. If you think that there's something wrong going wrong with how the claim is being processed and you're going to reverse course based on this new discovery, it certainly seems that would be something worth annotating. In hindsight, it's easy to tear through the claim files and say this should be done, this shouldn't be done, especially by us lawyers or judges because, you know, I agree. I agree. And I'm not talking for two to two microscopic lens. I'm just saying when there's a breach of policy that leads to a complete reversal, maybe a little annotation would go a long way. It may have. But actually, your honor, the breach of policy was that the nurse was able to provide that opinion in the first place. It shouldn't have gone to the nurse. It should have gone directly to a doctor. And I think that explains the timing of the whole situation where it should never have gone to the nurse for her to provide that opinion, because since there was already Dr. Klein's opinion, it should have gone to another doctor. And that would have been great to annotate in the claim file. I mean, that's great in the claim file. To me, at least, it looks really, really bad not in the claim file and only after an affidavit later once the benefits determination has been made. Understood, your honor. And trust me, I wish it was in there. I do. But let's put that aside. And you still have Dr. Klein and there's no claim of irregularity regarding that request. And it fully supports the denial. And again, I don't want to go through all that evidence I discussed earlier, especially on rebuttal here. That's substantial. Even if you put aside Dr. Klein, that's substantial evidence in and of itself that I think under de novo review would withstand scrutiny. But especially under arbitrary people. But two people purportedly considered Dr. Klein. One, Nurse Toth. And secondly, Mr. Jackson. Actually, if you look at Nurse Toth's report, she doesn't mention Dr. Klein, which I thought was interesting. She only mentions the updated medical records that were provided since the prior nurse reviews. And she mentions those other nurse reviews. I don't think she would, unless I missed it, I read through it a few times to make sure. But I don't think she was even aware of Dr. Klein's report because she only was, again, referring to the prior nurse reviews and then comparing it with the updated records. And that is itself a reason why you have to question that opinion and why a medical doctor's opinion is more important, especially in this case, and especially an independent medical examination, an in-person examination of the type that was performed here. But in just concluding, unless there are other questions, I think we have two very significant issues here. One is there was a finding of fact on a procedural irregularity without fact finding, which should not be allowed under the law. But also the district court here believed, apparently, based on these comments, that a material duty included driving, and it didn't. And the basis for this claim, again, was that Mr. Noga could not stand up without falling down, and that was a disability. But at the time this record closed, he was steady, he was no need to wear braces, he was no longer impaired. He could do everything. Counsel didn't explain why she said that he couldn't, that we only looked at the fact that he's sedentary, but she didn't explain why he couldn't perform the duties of his occupation. Under this deferential standard here, a court is not allowed to substitute its own judgment for that of the administrator. As the court has stated in Doroshow versus Hartford, it's a narrow focus. And even if you look beyond that, and you expand things to look at whether this procedural irregularity is significant, I don't think it matters, because under the facts, Mr. Noga failed to prove that he was totally disabled. The only other comment I would make is there were actually two policies involved in this case, one of which does have an any-occupation standard, that's the life waiver premium. So there's really no basis at all to claim that he's entitled to that benefit, but I would suggest, Your Honors, that there is no support for his claim under the regular occupation test as well. Right, thank you very much. I thank Your Honors for your time. Thank you both, both of the counsel, we had an extended argument well over an hour, so well done, both of you. Thank you very much for the extra time. And we'll take the matter under advisement and we'll recess for 10 minutes before we start the next case.